# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON WILLIAMS,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ANTHONY VERNA, et al.,<br><br>　　　　Defendants. | Case No.: 1:16-cv-00764-AWI-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>[ECF No. 39] |

Plaintiff Shannon Williams, a prisoner in the custody of the Federal Bureau of Prisons ("BOP") proceeding pro se filed the instant civil rights action pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971) on June 2, 2016.

Currently before the Court is Defendants' motion for summary judgment, filed on September 17, 2018.

**I.**

**PROCEDURAL HISTORY**

This action is proceeding against Defendants Brown and Verna in their individual capacity for retaliation in violation of the First Amendment, unreasonable search and seizure under the Fourth and Eighth Amendments, and cruel and unusual punishment in violation of the Eighth Amendment.

On November 6, 2017, Defendants filed an answer to the complaint. On November 7, 2017, the Court issued the discovery and scheduling order.

1

On September 7, 2018, the Court denied Defendant Verna's motion for summary judgment for failure to exhaust the administrative remedies.

On September 10, 2018, the undersigned issued Findings and Recommendations recommending that Plaintiff's motion for summary judgment be denied.

As previously stated, on September 17, 2018, Defendants filed a motion for summary judgment. Plaintiff did not file an opposition and the time to do has expired. Local Rule 230(l).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

///
///
///

# III.

# DISCUSSION

## A. Summary of Plaintiff's Complaint

On May 29, 2014, at approximately 3:20 p.m., Defendants Brown and Verna conducted a surprise cell raid. Defendant Brown demanded that Plaintiff submit to a visual strip search to which Plaintiff complained. After the search was conducted and it was clear that Plaintiff was not in possession of any contraband, Defendant Brown subjected Plaintiff to a second visual strip search. Plaintiff complained to several different staff members that officers Brown and Verna were embarrassing him and unnecessarily subjecting him to another visual strip search, after the first search did not reveal any contraband.

Plaintiff was subjected to two more strip searches in his cell where he was required to remove his underwear and bend over and spread his butt checks. After Plaintiff complained that officers Brown and Verna were violating policy, they did not allow him to put his clothing on and instead handcuffed him and made him walk in his underwear across the entire unit. As Plaintiff was being escorted through the housing units in only his underwear, several inmates were laughing and whistling at Plaintiff. Plaintiff eventually yelled that he wanted to file a grievance because officers Brown and Verna were sexually embarrassing him because he did not have any drugs on his person.

Plaintiff had just undergone surgery on his testicles, and the front of his underwear was stained with blood and fluid drainage. Plaintiff's testicles were swollen from the surgery. After officer Ochoa informed officer Brown that Plaintiff had surgery on his testicles which caused the swelling, officer Brown responded that Plaintiff could "get dressed when you give us some drugs."

Several female staff members observed Plaintiff as he walked through the prison in only his underwear. Upon arriving at the lieutenant's complex, lieutenant Zaragoza asked officer Verna "[w]ho brought him down here dressed like this? Did Brown do this? Plaintiff answered, "[t]hey both did. And I want to file a grievance right now for them trying to sexually embarrass me and retaliate against me for complaining and not having no [sic] drugs, in my cell." Plaintiff requested that lieutenant Zaragoza allow him to get dressed, and Zaragoza responded "I'm going to take you down to R&D strip you out, get you some boxers and if you don[']t have anything, I'm sending you back to

your housing unit." Zaragoza and Verna both conducted a visual strip search of Plaintiff and found no contraband.

Plaintiff was subsequently un-handcuffed and provided a pair of socks, a shirt and a pair of boxers to place over Plaintiff's briefs. Zaragosa informed Plaintiff that he was going to be released back to his housing unit. However, officer Brown (who was previously absent), showed up at R&D, and Zaragoza told Brown, "[w]e just stripped him out he does not have anything, I'm sending him back to the yard." Brown, while smiling, answered back, "I'm telling you Lt. this 'fucker' has big balls, he has something." Lieutenant Zaragosa responded, "I know how to conduct a strip search, he does not have anything. I am absolutely positive of that."

Plaintiff then told Zaragosa, "I am telling you they are tripping, they know I did not have nothing they walked me over here handcuffed, in just my draws after they stripped me out like three times in the unit, with six other officers ain[']t nobody saying I had shit but him [Brown] and Verna. This is bullshit I want you to write both of them up for this." Lieutenant Zaragosa shook his head and told Brown and Verna "release him back to his unit," and walked out of the R&D area.

After Zaragosa left, Brown stated "I don[']t care what the Lt. says, I want you to stand on this machine, if you refuse you[']re going to the SHU." Officer Verna then stated, "[g]o ahead and refuse so I can write it up, one way or another you going to the SHU today." After waiting about 20 minutes for the machine to start programming, officer Brown stated, "it does not look like we can get it started." Immediately thereafter, Plaintiff was placed back in handcuffs and transported back to the lieutenant's complex. Upon arrival, lieutenant Zaragosa stated, "I thought I told you two to release him back to his unit, why did you bring him back up here handcuffed? What did you do Williams I told you I was sending you back?" Plaintiff responded, "I did not do shit! They mad [sic] cause I ain[']t have nothing, and brought me back for nothing!"

Plaintiff was placed in a holding cell, and after forty-five minutes to an hour requested to use the restroom, which was denied by officer Verna. After repeated requests to use the restroom, officer Verna told Plaintiff "tell us who has some drugs and I'll let you use the restroom." Plaintiff eventually urinated on himself, and officer Verna laughed. Officer Verna then told officer Brown "lets get him for refusing a UA." Officer Brown told Plaintiff "you[']re going to the SHU for a 100 series refusing

4

a UA test." Plaintiff immediately requested to see lieutenant Zaragosa and yelled that they were "trying to retaliate and cover-up the bullshit yall [sic] did to me. I ain[']t refused no piss test, if that was the case I would not be in handcuffs." Officers Brown and Verna then transported Plaintiff to the SHU for refusing a UA test. Plaintiff told officer Verna, "[t]his is messed up, got me walking around women bleeding and with my draws piss in 'em, I am writing yall [sic] up for this." Verna laughed and told Plaintiff, "[n]ext time inmate you will learn who not to threaten with a grievance."

Plaintiff later received a write-up for refusing a urinalysis test, went to his UDC hearing and to the DHO three weeks later. After approximately five days in the SHU, Plaintiff informed Warden Paul Copenhaver that officers Brown and Verna had fabricated charges against him and walked him virtually naked throughout the facility, while knowing he did not have any contraband on his person, subjecting him to sexual humiliation by making him urinate on himself. Copenhaver told Plaintiff he could file a grievance and take it up with the DHO hearing officer.

At the DHO hearing, the hearing officer investigated and discovered that Plaintiff was handcuffed the entire time and Defendants refused to remove the handcuffs. The medical department was contacted and it was discovered that Plaintiff takes a diuretic daily that causes him to urinate throughout the day. Plaintiff was found to be innocent of the false charges.

On January 4, 2015, after Plaintiff had filed a grievance, officer Verna placed a 4-inch jailhouse shank in Plaintiff's assigned cell and filed a false incident report against Plaintiff stating he found the weapon in the mattress. In January 2016, officer Verna retaliated against Plaintiff again by writing him up for asking 6B unit officers to watch Verna because he had previously planted evidence in his cell.

At the DHO hearings, Plaintiff informed DHO that officer Verna was planting evidence and filing false charges against him because Plaintiff had previously filed grievances. The DHO stated there was no proof to support Plaintiff's allegations, and Plaintiff was found guilty of each of the charges.

///
///
///

5

**B.     Statement of Undisputed Facts**

1. Plaintiff, Shannon Williams, commenced this action on June 2, 2016, asserting claims arising out of visual strip searches at the United States Penitentiary at Atwater, California, in 2014. (ECF No. 1.)

2. Following an initial screening order pursuant to 28 U.S.C. § 1915A(a), Plaintiff filed an amended complaint in which he asserted various claims against Verna, Joshua Brown, Warden Paul Copenhaver and "unknown defendants." (Am. Compl., ECF No. 16.)

3. The Court's second screening order, filed on June 1, 2017, held that this action could proceed against Defendants Brown and Verna in their individual capacities for retaliation in violation of the First Amendment, unreasonable search and seizure under the Fourth and Eighth Amendments, and cruel and unusual punishment under the Eighth Amendment; all other claims were dismissed. (ECF No. 20 at p. 11; ECF No. 22, at p. 2.)

4. The Court's screening order found that Plaintiff stated a cognizable retaliation claim against Defendants Brown and Verna for performing repeated strip searches, forcing Plaintiff to walk through the prison in only his underwear, and for issuing false disciplinary charges for refusing to take a urinalysis test; and against Defendant Verna for issuance of false disciplinary charges in January 2016. (ECF No. 20, at p. 7.)

5. The Court's order further stated that liberally construed, Plaintiff's allegations that Defendants "repeatedly strip searched him despite knowledge that he was no in possession of contraband and required him to walk through the facility partially unclothed and exposed in front of other inmates and prison officials" stated a cognizable claim under the Fourth and Eighth Amendments. (ECF No. 20, at p. 8.)

6. The Court's order further stated that based on a liberal construction of Plaintiff's Eighth Amendment claim, Plaintiff stated a cognizable claim against Defendants "for retaining him in a holding cell and denying his request to use the bathroom facilities in order to compel Plaintiff to inform them of who was in possession of drugs." (ECF No. 20, at p. 9.)

///

///

7. On June 19, 2017, the United States Supreme Court held that where a claim arises in a new context, courts should not imply a Bivens remedy when the Plaintiff has alternative remedies or when the cases presents other special factors counselling hesitation. (Ziglar v. Abbasi, 137 S.Ct. 1843, 1857-60 (2017).

**C.  Defendants' Motion for Summary Judgment**

Defendants argue that each of Plaintiff's claims present a new context pursuant to the framework recently established by the Supreme Court in Ziglar v. Abbasi, __ U.S. __, 137 S.Ct. 1843 (2017) ("Abbasi"). In addition, even if the Court found a remedy in damages, Defendants are entitled to qualified immunity from Plaintiff's claims.

1. New Context Under Abbasi

In Abbasi, the Supreme Court clearly stated that "expanding the Bivens remedy is now a disfavored judicial activity," and the Court has "consistently refused to extend Bivens to any new context or new category of defendants." Ziglar v. Abbasi, 137 S.Ct. 1843, 1857 (2017) (citations omitted). The Court set forth a two-part test to determine whether a Bivens claim may proceed. The district court must first determine whether the claim presents a new context from previously established Bivens remedies. If so, the Court must then apply a "special factors" analysis to determine whether "special factors counsel hesitation" in expanding Bivens absent affirmative action by Congress. Id. at 1857, 1875.

"Since Bivens, the Supreme Court has recognized implied causes of action for damages against federal employees for only three types of constitutional violations: (1) a Fourth Amendment claim against federal agents for handcuffing a man in his home without a warrant, see Bivens, 403 U.S. 388; (2) gender discrimination by a congressman in violation of the Fifth Amendment for an employee not covered by Title VII, see Davis v. Passman, 442 U.S. 228 (1978); and (3) deliberate indifference toward a prisoner for failure to treat asthma in violation of the Eighth Amendment, see Carlson v. Green, 446 U.S. 14 (1980)." Adralan v. McHugh, No. 1:13-CV-01138-LHK, 2013 WL 6212710, at *10 (N.D. Cal. Nov. 27, 2013).

///
///

7

"The proper test for determining whether a case presents a new <u>Bivens</u> context is as follows. If the case is different in a meaningful way from previous <u>Bivens</u> cases decided by this Court [i.e., <u>Bivens</u>, <u>Davis</u> and <u>Carlson</u>], then the context is new." <u>Abbasi</u>, 137 S.Ct. at 1859. For instance:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous <u>Bivens</u> cases did not consider.

<u>Id.</u> at 1859-60.

The <u>Abbasi</u> Court explained that, when Bivens was decided, the Court routinely implied causes of action not explicit in statutory text. <u>Id.</u> at 1855. However, the Court has since rejected that approach, finding that, when a statute does not provide a cause of action, "a private cause of action will not be created through judicial mandate." <u>Id.</u> at 1856. Even if a case has "significant parallels" to one of the three previously recognized Bivens claim, and would only be a "modest extension," it would still arise in a new context. <u>Id.</u> at 1864.

**a.     Plaintiff's First Amendment Claim**

In this case, Plaintiff claims that Defendants Brown and Verna retaliated against him by performing repeated strip searches, forcing him to walk through the prison in only his underwear, and for issuing false disciplinary charges for refusing to take a urinalysis test; and against Defendant Verna for issuance of false disciplinary charges in January 2016.

This First Amendment retaliation claim presents a new context in <u>Bivens</u>, and the Court must proceed to consideration of the special factors. If the claim presents a new context in <u>Bivens</u>, the Court must consider whether there are special factors counseling against extension of <u>Bivens</u> into the area. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Abbasi</u>, 137 S. Ct. at 1857-58. The Court should assess the impact on governmental operations system-wise, including the burdens on government employees who are sued personally, as well as the projected costs and consequences to the government itself. <u>Id.</u> at 1858. In addition, "if

there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new Bivens cause of action." Id.

The Supreme Court has never implied a Bivens action under any clause of the First Amendment. See Reichie v. Howards, 566 U.S. 658 n.4 (2012) ("We have never held that Bivens extends to First Amendment claims."); Ashcroft v. Iqbal, 556 U.S. at 675 (assuming without deciding that Bivens extended to First Amendment claim). In addition, the Supreme Court declined to extend Bivens to a First Amendment free speech claim relating to federal employment noting "that Congress is in a better position to decide" the issue. Bush v. Lucas, 462 U.S. 367, 390 (1983).[1]

Based on the foregoing, the Court finds that under the analysis set forth in Abbasi, there is no implied right of a Bivens action for a retaliation claim, and this action should be dismissed. See, e.g., Free v. Peikar, Case No. 1:17-cv-00159-AWI-MSJ (PC), 2018 WL 1569030, at *2 (E.D. Cal. Mar. 30, 2018) (noting that nationwide, district courts seem to be in agreement that, post-Abbasi, prisoners have no right to bring a Bivens action for violation of the First Amendment).

**b.    Plaintiff's Fourth Amendment Claim**

Plaintiff contends that he was repeatedly subjected to an unreasonable strip searches and forced to walk across the unit in his briefs in violation of the Fourth Amendment.

Bivens involved an arrest and search of a private apartment by Federal Bureau of Narcotics agents. Bivens, 403 U.S. at 389. There, the plaintiff alleged that the agents, acting without a warrant and without probable cause, "manacled petitioner in front of his wife and children, and threatened to arrest the entire family," and "searched the apartment from stem to stern." Id. "Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search." Id.

---

[1] Although the Ninth Circuit has previously found that Bivens may be extended to First Amendment claims, Gibson v. United States, 781 F.2d 1334, 1342 (9th Cir. 1986) (permitting First Amendment retaliation claim under Bivens); Moss v. U.S. Secret Serv., 572 F.3d 962, 967 n.4 (9th Cir. 2009) (noting Bivens extends to First Amendment damages claims), it has recently addressed the issue in light of Abbasi, see Vega v. United States, 881 F.3d 1146, 1153 (9th Cir. 2018) (declining to extend Bivens remedy to First Amendment access to courts and Fifth Amendment procedural due process claims against private employees of residential reentry center). Therefore, the Ninth Circuit's pre-Abbasi opinions are not controlling.

Here, however, Plaintiff's claim involves the search of a prisoner for contraband detained in a United States Penitentiary, which presents a new context. Indeed, as explained by one district court, a claim involving a search of a pretrial detainee detained in a federal correctional center arose in a next context which necessitated the court to conduct the special factors analysis:

> Mr. Morgan's Fourth Amendment claim differs meaningfully from the Fourth Amendment claim in Bivens because his claim arises out of allegations concerning a routine search for contraband, not a warrantless search of a person. In addition, the body cavity search was conducted by correctional officers, not narcotics agents. Importantly, the search took place in a prison. This difference is meaningful because the Supreme Court has long distinguished its analysis of the Fourth Amendment when raised in the context of a prison facility. In doing so, it has emphasized that "[a] detention facility is a unique place fraught with serious security dangers," and therefore that an inmate's privacy interests must be balanced against the "significant and legitimate security interests of the institution." Bell v. Wolfish, 441 U.S. 520, 559-60 (1979). Mr. Morgan's Fourth Amendment search and seizure claim is therefore meaningfully different from the Fourth Amendment claim in Bivens, and thus presents a new Bivens context. Ziglar, 137 S.Ct. at 1860.

Morgan v. Shivers, No. 1:14-CV-7921-GHW, 2018 WL 618451, at *5 (S.D.N.Y. Jan. 29, 2018). The Court granted summary judgment on the Fourth Amendment claim finding special factors counselled hesitation in creation of a new Bivens remedy, particularly in the context of a search for prison contraband. Id. at *6 (noting that the detainee's claims "present a plethora of policy-related considerations that would require the Court to balance the challenges prison administrators and officers face in maintaining prison security against the expansion of private right of action for damages. This task is more appropriately suited for Congress, not the Judiciary."); see also Gonzalez v. Velez, 864F.3d 45, 53, n.3 (1st Cir. 2017) (refusing to extend Bivens to Fourth Amendment claims of federal employees who alleged their offices were unlawfully searched, "[g]iven the Supreme Court's manifest reluctance to extend the Bivens doctrine" and the fact that "Bivens involved the illegal search of an individual's home – an issue foreign to this case.").

For the same reasons explained by the Court in Morgan, Plaintiff's Fourth Amendment claim arises in a new context.

///
///
///

1    **c.    Plaintiff's Eighth Amendment Claim**

Plaintiff Eighth Amendment claim is based on his allegations that correctional officers retained him in a holding cell and denied his request to use the bathroom facilities in order to compel him to inform officers who was in possession of drugs, and forced him to walk the facility partially unclothed and exposed in front of other inmates and prison officials.

In Carlson, the Supreme Court extended Bivens to a claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment based on deliberate indifference to the serious medical needs of a prisoner, resulting in his death. Carlson, 446 U.S. at 16. In this instance, it is clear Plaintiff's Eighth Amendment claim does not involve medical care and arises in a new context, necessitating consideration of whether special factors counsel hesitation in the creation of a new remedy in damages. See, e.g., Winstead v. Matevousian, No. 1:17-CV-00951-LJO-BAM PC, 2018 WL 2021040, at *3 (E.D. Cal. May 1, 2018) (analyzing special factors and declining to expand a Bivens remedy under the Eighth Amendment for "claims arising out of an inmate assault, threats by officers, removal of mattress and deliberate indifference to those actions"); Lovett v. Ruda, No. 17-CV-02010-PAB-KLM, 2018 WL 3956596, at *28 (D. Colo. Aug. 17, 2018) (holding that prisoner's Eighth Amendment claim "focused on inadequacy of prison conditions in the form of food" clearly presented a new context from Carlson, and finding that availability of alternative remedies was reason not to imply a new remedy in damages). Accordingly, Plaintiff's Eighth Amendment conditions of confinement claim presents a new context.

2.    Special Factors Consideration

As discussed above, all of Plaintiff's claims arise in a new Bivens context, then the Court must consider whether there are special factors counseling against extension of Bivens into this area. Abbasi, 137 S.Ct. at 1857. The Supreme Court's precedents "now make clear that a Bivens remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" Id. Thus, "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1857-58. This requires the Court to assess the impact on governmental operations system-wide, including the burdens on government employees who are sued

personally, as well as the projected costs and consequences to the government itself. Id. at 1858. In addition, "if there is an affirmative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new Bivens cause of action." Id.

      **a.**      **Alternative Remedies**

Plaintiff has alternative remedies available to him. First, the Bureau of Prisons administrative grievance process affords prisoners, such as Plaintiff, a process for challenging conditions of their confinement. See Gonzalez v. Hasty, 269 F.Supp.3d 45, 60 (E.D.N.Y. 2017) (holding, post-Abbasi, that the administrative complaints that plaintiff-inmate filed with the BOP, though unsuccessful, were one of two "alternative remedies available" to Plaintiff "to challenge his conditions of confinement," and, while non-judicial and administrative in nature, they constituted, along with the availability of habeas relief, "special factors counseling against the creation of a new claim here"); cf. Correctional Services Corp. v. Malesko, 534 U.S. 61, 69 (2001) ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.") (citation omitted). Second, a prisoner who believes his constitutional rights are being violated may initiate an action for declaratory and injunctive relief. See 18 U.S.C. § 3626 (providing remedies in any civil action with respect to prison conditions). Although equitable remedies do not provide damages like a Bivens action, they are among the alternative processes that courts must consider in determining whether to extend an implied damages claim. Abbasi, 137 S.Ct. at 1865 (alternative remedies may include a "writ of habeas corpus, an injunction requiring the warden to bring his prison into compliance … or some other form of equitable relief"); Wilkie v. Robbins, 551 U.S. 537, 551-52 (2007) (listing the "opportunity to contest all of the administrative charges" and exercising "his right to jury trial on the criminal complaints" as available alternative remedies to landowner who sought Bivens remedy against Bureau of Land Management employees); Malesko, 534 U.S. at 551-52 ("unlike the Bivens remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally). Because alternative remedies are available to Plaintiff, this special factor counsel against further extension a Bivens damages claim.

///

### b. Congressional Action or Instruction/Separation of Power Principles

The specials factors inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Abbasi, 137 S.Ct. at 1857-58. Therefore, if there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress." Abbasi, 137 S.Ct. at 1858. "The Court's precedents now make clear that a Bivens remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." Id. at 1857 (internal quotation marks omitted).

In 1995, Congress enacted the Prison Litigation Reform Act (PLRA) to reduce the burden of prisoner litigation. See Williams v. Paramo, 775 F.3d 1182, 1185 (9th Cir. 2015) ("Congress enacted the PLRA in an effort to curb the large number of prisoner lawsuits filed in federal court."). Congress has been active in the area of prisoners' rights, and it has not created a private right of action for damages which is strong evidence of the inappropriateness of doing so through judicial implication. Abbasi, 137 S.Ct. at 1858-59; Schweiker v. Chilicky, 487 U.S. 412, 423 (1988) (courts should stay their Bivens hand when it appears that Congress' inaction with respect to providing an express damages remedy "has not been inadvertent."). As noted by the Supreme Court:

> Some 15 years after Carlson was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to Bivens suits. But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the Carlson damages remedy to cases involving other types of prisoner mistreatment.

Id. (internal citations omitted). Thus, the language and reforms imposed by the PLRA indicate that Congress would not approve an implied damages remedy for the claims presented here. Furthermore, given that Bivens is a judicially implied version of section 1983, it would violate separation-of-power principles if the implied remedy reached further than an express one. See Abbasi, 137 S.Ct. at 1857

(separation of powers principles counsels that Congress will usually be the proper body to decide whether damages should exist for a constitutional violation).

For the foregoing reasons, the Court finds that special factors counsel hesitation in this context, and should decline to find an implied <u>Bivens</u> cause of action here.[2]

## IV.
## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment be granted; and
2. Judgment should be entered in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __October 30, 2018__

UNITED STATES MAGISTRATE JUDGE

---

[2] Because the Court finds that Plaintiff's claims are barred by <u>Abbasi</u>, the Court does not reach Defendants' alternative argument for qualified immunity.

14